[Civ. No. 3087. Third Appellate District.—March 8, 1926.]

## C. W. BURNER, Respondent, v. AMERICAN BAR QUARTZ MINING COMPANY (a Corporation), Appellant.

[1] CONTRACTS—DELIVERY OF LUMBER—ALLEGED PROMISE TO PAY EXTRA COMPENSATION—AUTHORITY OF SUPERINTENDENT OF CORPORATION—EVIDENCE.—The mere fact that a person was the superintendent and general manager of a mining corporation, whose duty it was to see that a flume was constructed in accordance with the terms of a contract entered into between a contractor and the corporation, did not authorize such person to make a promise which would be binding on the corporation to pay a lumberman (who had entered into a contract with said contractor to cut and deliver to the latter a specified quantity of lumber) extra compensation for continuing to cut and deliver lumber after said lumberman had found that he had a losing contract, where it does not appear that said superintendent, in behalf of the corporation, had anything to do with the execution of the contract between said contractor and the corporation concerning the erection of the flume, or that such superintendent, or the corpora-

tion, had anything to do with the contract between the lumberman and said contractor concerning the lumber.

[2] ID.—EXTRA COMPENSATION—ALLEGED PROMISE—CONSIDERATION—EVIDENCE.—The promise alleged to have been made by the superintendent on behalf of the corporation to pay the lumberman extra compensation was void for want of consideration, where it does not appear that the corporation obtained anything to which it was not entitled under its contract with the contractor for the erection of the flume, and where it does not appear that the corporation agreed and promised that if the lumberman would do certain things which he was not obligated to do and thereby furnish something to the corporation which it was not otherwise entitled to receive, additional compensation would be paid.

(1) 2 **C. J.**, p. 643, n. 79, p. 645, n. 5, p. 646, n. 6, 7, 10; 13 **C. J.**, p. 777, n. 7; 40 **C. J.**, p. 1160, n. 49.   (2) 13 **C. J.**, p. 351, n. 27, p. 353, n. 45, 46, p. 356, n. 74.

APPEAL from a judgment of the Superior Court of Placer County.   J. B. Landis, Judge.   Reversed.

The facts are stated in the opinion of the court.

Hiram W. Johnson, Jr., and Carl E. Day for Appellant.

F. P. Tuttle, Sr., F. P. Tuttle, Jr., and Dixon L. Phillips for Respondent.

PLUMMER, J.—In this case, No. 7083 in the trial court, the plaintiff had judgment against the defendant for the sum of $2,870, from which judgment the defendant appeals. The action was brought by the plaintiff to foreclose a materialman's lien and for personal judgment. Foreclosure of lien was denied and personal judgment entered.

The record shows that some time during the year 1922, the defendant entered into a written contract with one Edward Martin for the erection of a certain flume for the sum of $31,000. The agreement specified that the contractor was to furnish all labor and materials, etc., and two certain bonds were executed in the sum of $16,000 each, one for the faithful performance and the other for labor and materials, etc.

2. See 6 Cal. Jur. 180; 6 R. C. L. 664.

After the execution of this written agreement Edward Martin entered into an agreement with the plaintiff whereby the plaintiff was to cut and deliver at the site of a certain sawmill operated by him some 400,000 feet of lumber, at the contract price of $23 per thousand. In accordance with this contract, it appears that approximately 410,000 board feet of lumber were sawed by the plaintiff and delivered to Martin. After the plaintiff had begun sawing lumber under his contract with Edward Martin and after about 140,000 feet of said lumber had been cut and delivered, the plaintiff ascertained that the price of $23 per thousand was not sufficient to compensate him for the expenses of furnishing, cutting, and delivering the said lumber. In other words, that he had a losing contract. Thereafter, and somewhere about the 10th of October, the plaintiff had a conversation with a certain Mr. Duffey, the superintendent of the defendant mining company, as follows:

"Q. You had a conversation about the first of October? A. Somewhere about the 10th of October,—somewhere about the first of October. Q. Up to that time you had delivered some lumber, had you? A. I think up to that time I think about in the neighborhood of one hundred and thirty or one hundred and forty thousand. Q. Where did this conversation take place? A. Why, I went to the river to see Mr. Duffey. I wanted money to pay my men, and went down to the river to see Mr. Duffey, and while there I told him I could not continue the way I was going; with the small mill I had I could not continue at the price, and also, if there was no chance of getting more pay for my lumber I could not keep cutting at $23 a thousand and— Q. What did he say to that? A. He seemed to be worried—he was worried as to the lumber,—he was afraid the winter would come, and storms and the lumber not be cut. Q. Did he say that? A. He did, and he was informed the job had been started, and if I discontinued cutting it would probably not get the lumber, and they never would get the job completed. I spoke to him about the price. He told me by no means to stop cutting, and asked me about the price, money was no object; that they would see me through if I would guarantee to get the lumber for them. Q. Did he say anything else? A. I informed him I could not cut the lumber,—I suggested to him I would put on a night shift to do so,

it would cost me considerable money, and I did equip my mill, I sawed at nights to fulfill my order with them. Q. What was the language used by Mr. Duffey, as near as you can recollect it in that conversation? A. Why, as near as I can recollect, he realized— Q. What did he say? A. He said he was willing for me to go ahead,—he said they had put up the money for this flume,—a certain amount of it, and he said if it stopped there would be no chance to get it started again, probably stop entirely. Q. Say anything with reference to the payment of the amount of $23. A. He did not,—he said he would see me through, gladly see that I was well paid for my work. Q. Did he say anything about paying anything above the $23? A. He did. Q. What did he say? A. He said to go ahead and cut, and they would take care of me under the circumstances, of any cost.''

Following this conversation the plaintiff, in November, had a conversation with the bookkeeper of the defendant, and with two directors, Mr. Kunz and Mr. Stevens. This conversation is as follows:

''Q. Now, coming to November, 1922, did you have any conversation with any of the officers or directors of the company at that time, in regard to this matter? A. I did. Q. Where? A. In their office in San Francisco. Q. You went to San Francisco? A. I did,—I went to San Francisco in November. Q. And you went to the company's office, the defendant in this case? A. I did. Q. Who was present at that conversation? A. Why, Mr. Kunz, Mr. Stevens and Willie Fink. Q. Who was Mr. Fink, how connected with the company, what position did he hold? A. I could not say; he was with the company at the American Bar, at that time. Q. Do you mean as an employee? A. Yes, I think he was. Q. Explain what the conversation was in the company's office, what was said? A. I went down with Mr. Fink,—I had been talking with Mr. Duffey, but I was commencing to get worried as to how I was coming out, and I went to the city with Mr. Fink for the purpose of seeing some of the company, and informed them in the office as to how I was coming out; that I was behind several hundred dollars, and I wanted them to give me something definite, whereas I was sure I could receive my extra money on this order of lumber. A. What extra money are you referring to? A. Extra money over the $23. Q. What did they say?

A. They informed me they could not give me anything in writing, as Mr. Martin,—as the contractor was using the lumber, he had a bonding company behind him, and if they interfered between me and Mr. Martin, the bonding company, that would let the bonding company out from under,—the way they expressed it. Q. Did they say anything to you about paying extra compensation? A. They did, they said they would assuredly take care of me, this mine with millions, and not let a man go hungry and walk out with his blankets on his back,—that they were not that kind of people. Q. Who told you that? A. Both Harry Kunz and Walter Stevens, also Billie Fink interrupted and assured me they were telling me right.''

Again, in February, 1923, plaintiff had a further conversation with Mr. Duffey as follows:

''Q. Did you have a further conversation with Mr. Duffey in the following February, in regard to this matter again? A. I did. Q. Where was that? A. Down on the ditch. Q. At the mine? A. It was on the river, on the flume above the mine, on the flume leading to the mine. Q. Who was there? A. Mr. Duffey, Orrin Jones and myself. Q. What was that conversation? A. We went to the river. He was not there. They said he was on the ditch. We went up to meet him, and he said to me all the way in the conversation, 'You got stung, my God I feel sorry for you,' and he went jumping around, and finally he said, well, he said, 'By golly, we have to pay these men, and want to pay these men now; I cannot do anything else at present, the McCandlesses are not here,'—but said,—'I have that power enough, whereas I can pay the men's wages that you owe.' Q. Your payroll? A. He told me to go ahead and send in my payroll for the men, and he would send it to the city office and pay them at once. He said as to the other money I was entitled to it. Q. What other money? A. He said as to the money I had run behind, whatever was fair for me to have, he would take it up with the McCandlesses, and he said they would be in San Francisco about the 15th of May, and they would get together and straighten everything up.''

The plaintiff further testified that during the period covered by these conversations he was furnishing lumber to Edward Martin, under the contract herein referred to. He further testified that neither Mr. Kunz nor Mr. Stevens

made any definite promises. It does not appear either
that in any of the conversations had with Mr. Duffey any
definite promises were made as to compensation. Mr. Mar-
tin, a witness called for the plaintiff, testified to being
present at one of the conversations between the plaintiff and
Mr. Duffey, and gives this version:

. "A. Mr. Burner was there,—before receiving payment, at
the previous conversation, and before receiving it he said,
'This is not in full,' it is full according to my original
agreement with him, but additional money promised,—
which I too, had promised him, having all the confidence
we could in the good intentions of the mining com-
pany. Q. What was said about Burner? A. Burner got
his payment to continue operating, which was the thing
Burner was interested in,—getting money enough to pay his
men; the men already harassed him from all sides. Q. He
said he would not accept payment in full? A. Yes, that is
right. Q. What else. A. Went back cutting lumber to finish
the four hundred thousand feet. Q. What took place with
Burner? A. He was satisfied to abide the time until the
meeting of the board of directors, and they would officially
give him the money? Q. That is what took place? A. Yes.
Q. That was when? A. Some time in November,—22d of
November, 1922. Q. In November, 1922, a payment was
made, and the result of that agreement was, that the under-
standing there was that Mr. Burner would abide by a presen-
tation of the subject to the board of directors,—correct? A.
Now, ask that question again, please? Q. In conversation
that took place in November, 1922, Burner received payment,
and it was agreed at that time that Mr. Burner would pre-
sent and abide by the board of directors' determination of
the matter? A. I want to change that a little,—I want to
say this: At that time Mr. Burner was satisfied to await
the time Mr. Duffey could make a recommendation,—to lay
all the facts before the board of directors, because there
never was any question in my mind but what Mr. Burner
could get the money from the mining company. Q. The
understanding was Mr. Duffey would lay the matter before
the board of directors and Mr. Burner would abide by the
result?"

[1]   It thus appears that the plaintiff is suing upon an oral
contract, if any, to pay extra compensation for the perform-

ance by the plaintiff of his written contract with Edward
Martin for the sawing and delivering of the 410,000 feet of
lumber, such compensation to be paid by other than a party
to the contract. As grounds for reversal the appellant al-
leges that Duffey, as superintendent, was without authority
to make any contract such as claimed by the plaintiff, and,
secondly, that the alleged contract is without consideration.

In support of the theory that Duffey, as the superintendent
of the defendant mining company, has authority to promise
additional compensation, the plaintiff introduced testimony
simply to the effect that Duffey was the superintendent and
general manager. In further support of the authority of
Duffey, the respondent cites the following: "Where an agent
is by his principal put in charge of a business in a certain
locality as the manager thereof, it is a general rule that
he is clothed with apparent authority to do all things that
are essential to the ordinary conduct of the business at such
place." (1 Cal. Jur., p. 745.) And, also: "Where one has
the actual charge and management of the general business
of a corporation with the knowledge of the members of the
directors, this is sufficient evidence of authority, and the
company will be bound by his contracts, made on their be-
half, within the apparent scope of the business entrusted to
him," citing *Aigeltinger* v. *Burke,* 176 Cal. 626 [169 Pac.
376], and *Leavens* v. *Pinkham & McKevitt,* 164 Cal. 248
[128 Pac. 399].

It does not appear from the testimony that Duffey, as the
superintendent of the mining company, had anything to do
with the contracts for building the flume entered into be-
tween the company and Mr. Martin, or with the contract
entered into by Martin and the plaintiff for furnishing the
former with the necessary lumber with which to build the
flume. Under such circumstances, the following, from 31
Cyc. 1387, appears to be applicable: "Presumptively an
agent is employed to make contracts, not to rescind or modify
them, to acquire interests, not to give them up, and no power
to cancel or vary an agreement is to be inferred from a gen-
eral power to make it, nor has the agent any implied
power to waive or give up rights or interests for his prin-
cipal, nor to increase his obligations and liabilities for the
mere benefit of third persons, unless the principal knew
or approved of such modifications by the agent. However, a

general agent may act under such broad power to contract in his own name, or to make terms or to settle upon his own discretion, as to overcome this presumption and bind the principal by the modification, rescission, or release of his agent.''

The testimony set forth in the transcript distinguishes the case at bar from the case of *Western Lithograph Co.* v. *Vanomar Producers*, 185 Cal. 366 [197 Pac. 103], hereinafter referred to in this opinion, in which it was held that the president of the defendant company had authority to make the contract there involved in this; in the Western Lithograph Company case, the president and secretary of the company had executed the contract for the corporation and the contract concerning which the extra compensation was promised was the contract of the corporation. In the case at bar the contract was not executed by the superintendent and was not, in fact, the contract of the corporation at all. It was a contract entered into by the plaintiff and Martin, for the performance of which it is alleged that Duffey, representing the corporation as a third party, promised extra compensation. It does not appear that Duffey, in behalf of the corporation, had anything to do with the execution of the contract between Martin and the corporation concerning the erection of the flume by Martin, nor does it appear that the corporation had anything to do with the contract between the plaintiff and Martin concerning the lumber. It does not show either that Duffey was charged with any other duty by the corporation than that of seeing that the flume was properly constructed by Edward Martin, the contractor with whom the defendant had a written contract.

We do not very well see how the mere fact that Duffey simply as superintendent of the defendant mining company, charged with the general duty of seeing that the company obtained from Mr. Martin a flume constructed according to a contract entered into between Edward Martin and the mining company, would authorize Duffey, as such superintendent without any further authority conferred upon him by the board of directors of the mining company, to compensate the plaintiff, because the plaintiff had ascertained that he had entered into a losing contract with Edward Martin, who had previously agreed in writing with the company to

perform certain labor, furnish materials and erect a certain structure for the sum of $31,000.

It is also clear from the testimony herein set forth that there is nothing definite or certain as to the promises made to the plaintiff by Duffey, even though the testimony were sufficient to show authority vested in Duffey to bind the corporation by any such promises or agreement.

[2] The objection that the alleged promise, if any, is void for want of consideration, we also think is well taken. It may be stated that it does not appear from the transcript that the defendant in this case obtained anything to which it was not entitled under the contract with Edward Martin, nor does it appear that the defendant agreed and promised that if the plaintiff would do certain things which he was not obligated to do and thereby furnish something to the defendant which it was not otherwise entitled to receive, additional compensation would be paid. The most that does appear is that the plaintiff stated he would put on a night shift and in this way be able to fill his contract. The plaintiff in this particular sets forth section 1605 of the Civil Code, which reads as follows: "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise." However, it does not appear that the alleged promisor in this case was obtaining anything to which it was not legally entitled under its contract with Martin, and which the plaintiff, in turn, under his contract with Martin, was obligated to furnish to Martin, in order that Martin might comply with his contract with the defendant. A very similar question came before the supreme court of this state in *Western Lithograph Co.* v. *Vanomar Producers,* 185 Cal. 366 [197 Pac. 103]. In that case a contract had been entered into for the furnishing of labels at a certain price. Thereafter it became apparent that the contract was a losing one on the part of the plaintiff. The plaintiff obtained from the president and general manager of the defendant a promise of an increase in the price to be paid for the labels in the sum of 35¢ per thousand extra. The president wrote the following letter:

"Gentlemen: Referring to the conversation held between your Mr. Courtlander and the writer, we wish to say that we shall be very glad to pay you a sum equal to 35¢ per M., beyond our contract price, for all labels which we may receive from you this season's pack. We appreciate the efforts you have made in the past to meet our wishes and requirements and thoroughly understand some of the obstacles which confront you in the endeavor to take care of your large business this season."

In this case it appears that the president had been by the company permitted to carry on business in such a way as to bring the contract in question within the apparent scope of his authority, but it was held that the agreement was without consideration and this, notwithstanding the fact that the defendant in that case received and paid for a considerable quantity of labels at the increased price. The court, in commenting upon this phase of the case, said: "Now, the letter of June 15, 1917, was merely an agreement to pay an increase over the prices at which the plaintiff was already lawfully bound to the defendant to deliver labels. It is evident that because of the promise the defendant received no benefit, nor was it agreed that it should receive any, to which it was not already lawfully entitled. It is likewise evident that the plaintiff did nothing and agreed to do nothing which it was not already obligated to do. A plainer case of a mere naked promise it would be difficult to imagine. The courts in some instances have held that where one party to a contract refuses to go on with it, and the other party to induce him to go on promises to pay him additional compensation, such promise is supported by a consideration. The theories upon which this conclusion is reached are various and it is exceedingly doubtful if any of them are sound. (*Alaska Packers Assn.* v. *Domenico,* 117 Fed. 99 [54 C. C. A. 485].) The authorities are collated and their different rules well stated in 13 Corpus Juris, 351–355. But so far as we are aware, the authorities are in practical agreement that where, as here, all that appears is that one party found himself with a losing contract and without abandoning it, requested the other party to pay him more, which the other party promised to do, the promise is without consideration." The court further in that case commented upon the decisions of the Minnesota supreme court (*Michaud*

v. *MacGregor,* 61 Minn. 198 [63 N. W. 479]; *King* v. *Duluth etc. Co.,* 61 Minn. 482 [63 N. W. 1105]), apparently holding to a different rule, and pointed out the inapplicability of the ruling of the supreme court of Minnesota to the case at bar.   It is further set forth that extra costs and difficulties, such as increase in the cost of manufacture, inadequacy of the contract price, which is the result of error of judgment and not of some inexcusable mistake of fact, is not sufficient upon which to predicate a consideration for a promise to pay extra compensation.   To the same effect is the case of *Marinovich* v. *Kilburn,* 153 Cal. 638 [96 Pac. 303].   In 6 Cal. Jur. 180, section 123, the rule is also clearly set forth relating to alleged promises of extra compensation showing that under the circumstances at bar the alleged promise is not supported by any consideration.   Likewise, in 13 C. J., pages 351 to 357, the cases holding that the promise of extra compensation alleged as the basis or consideration by the promisee to perform an obligation which he is already under legal obligation to perform is without consideration.   As heretofore stated, the only consideration in this case was the furnishing of Edward Martin with the lumber which the plaintiff was already under legal obligation to furnish, and we think this case comes clearly within the rules laid down in the authorities which we have cited showing that the alleged contract is void for want of consideration; it follows that the judgment of the trial court must be reversed, and it is so ordered.

Pullen, J., *pro tem.,* and Finch, P. J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 5, 1926.